## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MOSES SEBUNYA**, <br><br> Plaintiff, <br><br> v. <br><br> **ALEJANDRO N. MAYORKAS**, Secretary, <br> U.S. Department of Homeland Security, <br><br><br> Defendant. | Case No. 21-cv-780 (CRC) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Moses Sebunya, a former reservist employee of the Federal Emergency

Management Agency ("FEMA" or "the agency"), sued the agency for violations of Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e <u>et seq.</u>, and the Age Discrimination in

Employment Act ("ADEA"), 29 U.S.C. § 623 <u>et seq.</u> He alleges that the agency retaliated and

discriminated against him through a series of incidents beginning in 2017 and culminating in his

termination in 2020. Following discovery, both sides have moved for summary judgment. The

agency seeks summary judgment on all of Sebunya's claims while Sebunya moves only on the

agency's affirmative defense that he failed to mitigate damages. Because the Court finds

Sebunya has offered enough evidence for a reasonable jury to conclude that some of the

agency's actions were retaliatory or discriminatory, it will grant the agency's motion in part and

deny it in part. And, because the agency has failed to raise a genuine dispute about whether

Sebunya reasonably mitigated damages, the Court will grant his motion.

## I.   Background

The following background is predominantly taken from Defendant's Statement of Material Facts As To Which There is No Genuine Issue where the facts have been admitted by the Plaintiff.  See Plaintiff's Response to Defendant's Statement of Facts ("Pl.'s Resp.").  Where there is disagreement, the facts are drawn from the evidence presented viewed in the light most favorable to the non-movant.

Sebunya served as an Equal Rights Advisor ("ERA") in FEMA's Office of Equal Rights ("OER") from 1997 to March 2020.  Pl.'s Resp. ¶ 2.  He is originally from Uganda, is Black, and is a practicing Muslim.  Id. ¶ 1; Pl.'s Opp'n at 1.  He was 59 years old in 2017 and 62 years old in 2020 (the primary years relevant to this case).  Pl. Resp. ¶ 1.  Like most of FEMA's ERAs, Sebunya was an intermittent, on-call employee known as a reservist.  Id. ¶ 4.  Reservists are deployed to disaster zones and receive pay only when deployed.  Id.  When not deployed, they return to their residence, which for Sebunya was Portland, Maine.  Id.; Defendant's Response to Plaintiff's Statement of Material Facts In Dispute ("Def.'s Resp.") ¶ 2.  Reservists generally receive two-year appointments renewable at FEMA's discretion and are exempt from civil service protections.  Pl.'s Resp. ¶ 5.

Reservists are supervised through two chains of command.  First, they are organized into one of 23 "cadres," each overseen by a "cadre coordinator."  Id. ¶ 6.  The cadre coordinator distributes rules and provides guidance no matter the deployment and is involved in decisions to hire, fire, or renew reservists' appointments.  Id.  During the relevant period, Roslyn Dunn-Alexander served as Sebunya's cadre coordinator.  Id.  Second, when reservists deploy to disaster sites, they are supervised on a day-to-day basis by on-site supervisors.  Id.  These supervisors do not have the authority to hire or fire reservists but can "demobilize" reservists

(*i.e.*, send them home) after consultation with the cadre coordinator or FEMA's human resources department.  Id.

During the relevant time, ERAs in OER performed both internal and external anti-discrimination work.  On the internal side, they processed discrimination complaints by FEMA employees, and, on the external side, they instituted programs and met with stakeholders to prevent discrimination in the provision of federal disaster assistance.  Id. ¶ 8.

Sebunya's complaint describes a series of incidents in 2017 and 2020, which the Court will now catalog.

### A.   June 2017 Missouri Disaster

In June 2017, Sebunya deployed to Missouri as part of FEMA's response to a natural disaster.  Id. ¶ 10.  Raymond Hetherington, who served as the chief of staff for the disaster, was Sebunya's on-site supervisor.  Id.  On June 16, Hetherington approached Sebunya to discuss interpersonal issues Hetherington had identified among employees in the FEMA office.  Id. ¶ 12. Hetherington explained that he had talked to another employee, Shelli Holmes, about transferring her to a disaster site in Arkansas and told Sebunya she might call him.  Id.  Sebunya reported that they had already spoken.  Id.  According to Sebunya, Holmes had earlier approached him for assistance filing an EEO complaint against Hetherington and another supervisor at the disaster site.  Pl.'s Statement of Additional Material Facts ("SAMF") ¶ 60.

As part of Hetherington and Sebunya's conversation, Sebunya mentioned that he had been president of the Maine chapter of the National Association for the Advancement of Colored People ("NAACP").  Pl.'s Resp. ¶ 13.  Sebunya also repeated an anecdote involving the Ku Klux Klan ("KKK"), which he had used to explain to Holmes that "not all mistreatment in the workplace is illegal."  Id.  According to emails Hetherington sent later that week, Sebunya also

stated three times that he was "good at taking the fine details and hanging people."  Id. ¶ 14; Ex. 8 at 2.[1]  Sebunya denies making any such comments.  Pl.'s Opp'n, Declaration of Moses Sebunya ("Sebunya Decl.") ¶ 2.

On June 19, Hetherington called Dunn-Alexander to discuss his conversation with Sebunya.  Pl.'s Resp. ¶ 15.  During the call, Hetherington consulted with her about demobilizing Sebunya and ultimately chose to do so.  Id. ¶¶ 15–16.  In a follow-up email, Hetherington again described his June 16 conversation with Sebunya, noting that Sebunya "spoke of being the President of the NAACP in Maine, and a story regarding the KKK."  Ex. 100 at P000146.  Hetherington wrote that he was "not sure how the KKK tied into the conversation, but it did make [him] a little uncomfortable."  Id.  He added that Sebunya's comment about "hanging people" was "[t]he portion of the conversation which continued to nag at [him] as possibly promoting a confrontational environment rather than one conducive to rectifying issues."  Id.  In the email, Hetherington also recounted that Sebunya had rearranged the furniture in the FEMA office in a way that "effectively blocked any view of [Sebunya] being present in the office and effectively reduced the walkway between two ERA tables."  Id.  In Hetherington's view, the rearrangement "appear[ed] to the outsider to create a less than inviting setting."  Id.

After receiving Hetherington's email, Dunn-Alexander informed Sebunya that he was being demobilized because of comments that "created an uncomfortable, threat[en]ing and possibly . . . confrontational environment," and a "lack of confidence consistent with the Office of Equal Rights['] ("OER") responsibilities and our agency['s] zero tolerance policy."  Id. at

_____

[1]  The cited exhibits are drawn from FEMA's Motion for Summary Judgment and the Declaration of Braden Beard ("Beard Decl.") submitted in support of Sebunya's Opposition.  FEMA's exhibits are numbered 1–33; Sebunya's are numbered 100–203.

P000160.  On an evaluation form about the disaster, Sebunya wrote that his demobilization was "due [to] allegations made by the Chief of Staff about the NAACP and KKK, a translation twisted to meet racial and discriminatory behavior."  Ex. 5 at 000126.  He added, "Release was racially motivated by the [Chief of Staff] who interfered in process obstructing my ability [to] conduct a transparent EEO inquiry of a black employee."  Id.

Shortly after the demobilization, Sebunya contacted an ERA still at the disaster recovery office, Suzanne Miller, to initiate an EEO complaint.  Pl.'s Resp. ¶ 20.  He also informed Dunn-Alexander that he was filing a complaint.  Ex. 100 (Email from Dunn-Alexander) at P000145.

B.  June 2017 California Disaster

A few days later, on June 23, 2017, Sebunya received an order to deploy to a disaster site in California.  Pl.'s Resp. ¶ 21.  According to an email Dunn-Alexander later sent summarizing the sequence of events, he travelled to California on June 26 and arrived at the disaster on June 27 even though his deployment order directed him to arrive on July 4.  Ex. 11 at 000143.  Dunn-Alexander wrote that Sebunya "mistook" her June 22 email and their "verbal conversation" on June 25 as directing him to arrive June 27.  Id.  In the June 22 email, which Dunn-Alexander sent to several deployed ERAs and requested they share with their on-site chiefs of staff, she described new training procedures and instructed the ERAs to "respond by 1:00 pm EDT on Tuesday, 27 June 2017" with responses from their chiefs of staff.  Id. at 000145.  As for the conversation, Sebunya recounted in his deposition that Dunn-Alexander called him on June 25 and told him to travel to California on "Monday" (June 26) and "get there on Tuesday, immediately."  Ex. 196 at 117:8–9.

According to Dunn-Alexander's summary email, Sebunya was then demobilized because his early arrival constituted a "self-deployment."  Ex. 11 at 001144.  In the email, Dunn-

5

Alexander cited a FEMA Deployment Directive that stated, "all FEMA employees must arrive at the incident duty station by the time specified in the deployment order." Id.; see also Ex. 114 (FEMA Reservist Program Directive) at P001204 (reservists are to "[d]eploy only when directed to do so by official deployment order" and to "not self-deploy under any circumstances").

C. Reply-All Email

In September 2017, Rodney Grant, an OER EEO Specialist, emailed 23 other staff members, including Sebunya, and directed them to provide "a report of any open EEO Counseling cases awaiting ADR ***immediately***." Ex. 13 at 000150 (emphasis in original). Grant asked the staff members to send the information to three individuals, including Nicole Oke, an OER unit chief. Id. Suzanne Miller, the other ERA who had been deployed to the Missouri disaster, "inadvertently" replied to all the email recipients with a list of open cases from the Missouri disaster. Id. at 000149–50; Ex. 6 (Miller Affidavit) at 000108. That list included Sebunya's name and a brief status update on his case ("open – transferred to Headquarters – Doug Goudy"). Ex. 13 at 000149. The next morning, Oke instructed Miller to "attempt to recall [the email] immediately" because she had sent it to "individuals who do not have a need to know about these EEO complaints." Id. at 000148. Miller responded that she was not "aware" she had replied to all and understood that doing so was "rarely appropriate." Id. Oke responded, "Thanks, Suzanne. Mistakes happen." Id. Miller attempted to recall the email but could not withdraw it from recipients who had already opened it. Ex. 6 at 000108.

D. Deployment Orders in Late 2017

In late 2017, several relevant incidents occurred. *First*, two of Sebunya's deployments were cancelled before he deployed. In October 2017, he received an order to deploy to another disaster in California. Shortly after, two ERAs at a disaster in Nevada had a dispute, leading

6

OER leadership to redeploy one of them to the California disaster and bump Sebunya from the assignment.  Pl.'s Resp. ¶ 27.  In an email sent to other leadership, Rodney Grant explained that he redeployed one of the Nevada ERAs to avoid "escalating a matter that we would later have to address via a Letter of Reprimand."  Ex. 197 at P001305.  Grant "explained to Mr. Sebunya all that [he] could without revealing the pending personnel matter."  Id.[2]  Later that month, Sebunya received a deployment order to Nevada that leadership at the disaster then cancelled.  Ex. 16 (Email between Grant and disaster leadership).

*Second*, Sebunya was not allowed to switch assignments with another ERA.  In December, Sebunya "deployed" to a virtual disaster.  Id. ¶ 29.  A second ERA, John Long, who had received an assignment to Puerto Rico, requested to swap with Sebunya for personal reasons. Id.; Ex. 17 (Emails between Long and Dunn-Alexander) at 1.  Dunn-Alexander denied the request, noting that Long's deployment was for a "trainee[] advisor" whereas Sebunya was a "Lead OER Advisor."  Ex. 17 at 1.

E.  Termination[3]

In early 2018, Dunn-Alexander recommended that Sebunya, along with several other reservists, not be reappointed because of their "conduct, behavior, and performance."  Ex. 138

---

[2]  According to a formal reprimand Dunn-Alexander drafted, Sebunya called her to discuss the cancellation of his California deployment.  Ex. 148 (Draft Reprimand Letter) at P001237.  When she returned his call, he "yelled at" her.  Id.  According to Dunn-Alexander, he asked "[w]hat is going on with our deployments?" and "[w]hy are you playing with our lives?" and then stated he was "going to call the big boss, . . . just like [he] had to do before."  Id. Sebunya denies yelling at Dunn-Alexander.  Sebunya Decl. ¶ 4.  Dunn-Alexander sent a draft of the reprimand letter to her supervisor, James Montgomery, but he never approved it.  Ex. 148 at P001235.

[3]  Recall that Sebunya was an appointed reservist.  The parties dispute whether Sebunya's non-reappointment is equivalent to a termination.  Agency witnesses distinguished between the two terms during depositions, Ex. 21 (Dunn-Alexander Deposition) at 123:12–13; Ex. 25

(Dunn-Alexander EEO Investigative Affidavit) at 005749–50.  Her supervisor, James Montgomery, rejected the recommendations.  Id. at 005750.

Then, in 2019, OER's focus shifted.  Previously, ERAs had performed a combination of "internal and external civil rights work" but focused "quite a bit o[n] internal EEO complaint work."  Ex. 129 (Montgomery EEO Investigative Affidavit) at 005807.  According to Dunn-Alexander, ERAs were spending 80 percent of their time on EEO complaints and 20 percent on external civil rights.  Ex. 27 (Email from Dunn-Alexander to Sebunya) at 000624; see also Ex. 129 at 005807 ("At one time, about 70% of [OER's] internal EEO complaints came from disaster reservists.").  In 2019, however, ERAs shifted their focus to "100%" external work.  Ex. 27 at 000624; see also Pl.'s Resp. ¶ 30 ("[T]he change in 2019 was [to] remov[e] one responsibility— processing EEO complaints—and [focus] only on the other responsibilities, which included external civil rights work and processing reasonable accommodation requests.").  As part of this process, ERAs' titles were changed to Civil Rights Advisors ("CRAs").  Id. ¶ 31.  For ease of comprehension, the Court will continue to refer to them as ERAs.

As part of this "realignment" of responsibilities, ERAs were directed to upload documents to a shared FEMA folder, called the "O Drive," id. ¶ 32, and received training on the new O-Drive procedures in February 2019, see Ex. 188 (Sebunya's Deployment History) at 000325; Ex. 201 (Email describing O-Drive Training) at 011620.

---

(Johnson Deposition) at 11:7–9, but Sebunya notes that FEMA's Chief Component HR Officer identified the two as synonymous in an email, Ex. 168 at D005838.  Because the terminology is not material, the Court will use the two terms interchangeably and does not decide whether a non-reappointment is legally equivalent to a termination.

In June 2019, an OER employee completed an "audit" of the O Drive, which she sent to Dunn-Alexander. Ex. 181 at 000737. As part of the audit, the employee reviewed whether ERAs had uploaded documents to their O-Drive folders and followed "file naming convention[s]." Id. at 000738. For one deployment that Sebunya had recently completed, the audit reflected that all of the O-Drive folders were empty. Id. at 000739; Pl.'s Resp. ¶ 34. For another disaster, he had uploaded documents to only five of the eleven possible folders. Ex. 181 at 000739.

In January 2020, OER began the process of determining which ERAs would receive new two-year appointments, as many of the appointments, including Sebunya's, expired in March 2020. Pl.'s Resp. ¶ 36. In early February, Dunn-Alexander sent OER's then-Director, Jo Linda Johnson, a list of employees, including Sebunya, that Dunn-Alexander recommended OER terminate. Ex. 24 at 011343. Johnson asked Dunn-Alexander to "add [her] rational as to why" and to "limit [her]self to no more than three bullet points per person." Id. at 011339. Dunn-Alexander listed three reasons for terminating Sebunya: "[1] Nonresponsive to cadre's guidance, [2] Refused to complete deployment products without one-on-one training, and [3] nonresponsive to disaster leadership request." Id. at 011343. Dunn-Alexander gave the rationale "non-responsive to cadre guidance" for seven of the nine employees on the termination list, the rationale "non-responsive to disaster leadership request" for six, and a variation of "refused to complete deployment products without one-on-one training" for all nine. Ex. 126 (Dunn-

Alexander Email to HR Specialist) at 006948–51.[4]  Johnson approved all of Dunn-Alexander's recommendations.

On March 6, Dunn-Alexander issued Sebunya a Notice of Non-Reappointment.  Ex. 29 at 1.  The notice stated that his appointment would not be renewed following the expiration of the appointment at the end of the month.  Id.

F.   Post-Termination Employment

Soon after his termination, Sebunya accepted employment in an entry-level position with FEMA at a wage of $16 per hour.  Def.'s Resp. ¶ 2.  His salary as an ERA had hovered between $56 and $63 per hour.  Id. ¶ 1.  He left the entry-level position nine months later, in November 2020, Ex. 188 at 000323 (Sebunya's FEMA Employment History), because he said the pay cut "didn't work out for [him]" and the change in job responsibilities "stunned [his] ego" and "cut[] down his pride," Ex. 196 (Sebunya Deposition) at 131:13, 20–21.  In May 2021, after applying "to numerous jobs in a variety of fields and [at] a range of organizations," he began a position in Augusta, Maine with the Maine Department of Labor, where his starting wage was $18.60 per hour.  Def.'s Resp. ¶¶ 3–4.  He worked there for three weeks and then quit because the position was 60 miles from his home in Portland, the cost of "gas was high," and "the money was low." Ex. 196 at 133:12–14.  He was unemployed until January 2022, when he began a position with the Maine Department of Labor as a Career Consultant.  Ex. 194 (Maine Department of Labor Offer of Employment) at P002435.  His starting salary was $17.85 per hour, id., and his current salary is between $43,000 and $45,000 annually, Ex. 196 at 130:20.

---

[4]  Initially, Dunn-Alexander recommended that seven ERAs be terminated.  Ex. 24 at 011343.  Two ERAs were added to the list by March, and the agency terminated nine in total. Ex. 126 at 006948–51.

G.  <u>Procedural History</u>

Sebunya filed two EEO complaints as relevant here.  His first formal complaint, on December 7, 2017, alleged discrimination and a hostile work environment based on, among other incidents, his demobilization from the June 2017 Missouri disaster, management's conflicting instructions about his California deployment, and the reply-all email.  Pl.'s Resp. ¶ 48.  The agency issued its final decision in May 2020, finding Sebunya failed to prove discrimination.  <u>Id.</u> ¶ 49.  In July of that year, Sebunya filed his second EEO complaint alleging his non-reappointment was discriminatory.  <u>Id.</u> ¶ 52; <u>see also</u> Ex. 31 at 2.  The agency again found no discrimination.  Pl.'s Resp. ¶ 53.  He filed this lawsuit in July 2020 and later amended his complaint to include both EEO complaints.  <u>Id.</u> ¶¶ 50, 54.

Before the Court now are two motions for summary judgment.  The agency has moved for summary judgment on all of Sebunya's claims.  Def.'s Mot. Summ. J.  Sebunya has cross-moved on the agency's affirmative defense that he failed to mitigate damages.  Pl.'s Mot. Summ. J.  Both motions are ripe and ready for resolution.

**II.  Legal Standards**

Courts must grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is material if 'it might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Steele v. Schafer</u>, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  The burden of demonstrating "absence of a genuine issue of material fact" lies with the movant.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1).

When deciding a motion for summary judgment, courts must "view the facts and draw reasonable inferences 'in the light most favorable to the [non-moving] party . . . .'" Scott v. Harris, 550 U.S. 372, 378 (2007) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)).  The non-movant may not, however, rely on "mere allegations" or conclusory statements to defeat a motion for summary judgment.  Veitch v. England, 471 F.3d 124, 134 (D.C. Cir. 2006) (Rogers, J., concurring).

### III.   Analysis

A.  Compliance with Local Civil Rule 7(h)

As a threshold matter, Sebunya asks the Court to "disregard [] factual statements that [FEMA] included only in its Memorandum and not in its Statement of Material Facts."  Pl.'s Opp'n at 12.  Sebunya is correct that Local Civil Rule 7(h) requires a "motion for summary judgment [to] be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement."  LCvR 7(h).  And he is also correct that FEMA, having failed to include certain material facts in its statement, tried to shoehorn those facts into its briefs.

But the Court will not impose the sanction Sebunya requests.  Though LCvR 7(h) permits a court to deem admitted any facts in the moving party's statement that are uncontroverted by the non-moving party's statement, the rule does not contemplate a similar sanction for the *moving party's* failure to include facts.  And, it seems, for good reason.  Because, on a motion for summary judgment, the Court must believe "[t]he evidence of the non-movant" and draw "all justifiable inferences . . . in his favor," the non-moving party already gets the benefit of the Court accepting his facts as true.  Anderson, 477 U.S. at 255.  Moreover, the in-circuit cases cited by Sebunya do not compel a different result.  They involve parties who entirely ignored the

requirements of Local Civil Rule 7(h).  <u>See, e.g.</u>, <u>Gardels v. Cent. Intel. Agency</u>, 637 F.2d 770, 773 (D.C. Cir. 1980) ("The[] purposes [of the rule] clearly are not served when one party . . . fails in his statement to specify the material facts upon which he relies and merely incorporates entire affidavits and other materials . . . ."); <u>Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner</u>, 101 F.3d 145, 153 (D.C. Cir. 1996) ("Twenty-nine pages long, . . . [r]eplete with factual allegations not material to [plaintiff's] substantive claims and repeatedly blending factual assertions with legal argument, the 'relevant facts' section does not satisfy the purposes" of the local rule).  Though certain material facts are not in the agency's statement and should be, the Court will not—as a blanket matter—disregard them.

B.  <u>Applicable Framework</u>

In cases involving circumstantial evidence of discrimination or retaliation, courts apply the <u>McDonnell Douglas</u> burden-shifting framework.  <u>See</u> <u>Wheeler v. Georgetown Univ. Hosp.</u>, 812 F.3d 1109, 1113 (D.C. Cir. 2016); <u>McGrath v. Clinton</u>, 666 F.3d 1377, 1383 (D.C. Cir. 2012).[5]  At the first stage, the employee must establish his prima facie case.  <u>Wheeler</u>, 812 F.3d at 1113–14.  If he does so, "the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action."  <u>Id.</u> at 1114.  If the employer does so, the "burden then shifts back" to the employee, who must prove that the "employer's stated reason for its actions was in fact pretext for unlawful discrimination."  <u>Id.</u>

The D.C. Circuit, however, has crafted a "shortcut" for resolving motions for summary judgment.  <u>Figueroa v. Pompeo</u>, 923 F.3d 1078, 1087 (D.C. Cir. 2019).  Under the so-called

---

[5]  As noted below, Sebunya has also offered some direct evidence of retaliation.  The Court will address the standard for that evidence where applicable.

<u>Brady</u> shortcut, "[w]hen the employer properly presents a legitimate, nondiscriminatory reason, the District Court 'need not—and should not—decide whether the plaintiff actually made out a prima facie case.'"  <u>Id.</u> (quoting <u>Brady v. Off. of Sergeant at Arms</u>, 520 F.3d 490, 494 (D.C. Cir. 2008)).  Instead, "the district court must resolve one central question:  Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?"  <u>Brady</u>, 520 F.3d at 494.[6]

In answering this question, the Court must consider "whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff or any contrary evidence that may be available to the employer."  <u>Wheeler</u>, 812 F.3d at 1114 (cleaned up).  An employment discrimination plaintiff, however, is not "presumptively required" "to submit evidence over and above rebutting the employer's stated explanation."  <u>Aka v. Wash. Hosp. Ctr.</u>, 156 F.3d 1284, 1290, 1292 (D.C. Cir. 1998) (en banc) (cleaned up).  "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 147 (2000).  But "[t]he ultimate burden of persuading the trier of fact

---

[6]  The <u>Brady</u> framework also applies to retaliation claims and to age-discrimination claims brought under the ADEA.  <u>See</u> <u>Jones v. Bernanke</u>, 557 F.3d 670, 678 (D.C. Cir. 2009) (<u>Brady</u> "principles apply equally to retaliation claims"); <u>DeJesus v. WP Co. LLC</u>, 841 F.3d 527, 532 (D.C. Cir. 2016) (applying both <u>McDonnell-Douglas</u> and <u>Brady</u> to an ADEA claim).

that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 253 (1981).

The circuit has cautioned, however, that "the Brady shortcut applies only if the parties properly move past the second step" of the McDonnell Douglas framework. Figueroa, 923 F.3d at 1087. "Brady does not pretermit serious deliberation at the second prong. Nor does it imply that the District Court may relieve the employer of its burden, at the second prong, 'to articulate a legitimate, nondiscriminatory reason for its action.'" Id. (quoting Wheeler, 812 F.3d at 1114).

The parties agree that the Brady framework applies to most of Sebunya's claims. See Def.'s Mot. Summ. J. at 2–3; Pl.'s Opp'n at 8–9. But Sebunya contends that FEMA failed to provide a legitimate, nondiscriminatory reason for Sebunya's termination in March 2020. Specifically, Sebunya contends that the justifications given by his supervisor were too "insubstantial" to supply a "'legitimate, nondiscriminatory, clear, and reasonably specific explanation'" for firing him. Pl.'s Opp'n at 19 (citing Figueroa, 923 F.3d at 1092). Under the second step, the employer's "evidence must present a clear and reasonably specific explanation" for the adverse event. Figueroa, 923 F.3d at 1088 (cleaned up). This is because a "central purpose of the second prong is to focus the issues and provide the worker with a full and fair opportunity to attack the explanation as pretextual." Id. (cleaned up). The employer cannot "conceal[] the target at which [the plaintiff] must aim pretext arguments." Id. (cleaned up).

FEMA erected an adequate target with its justifications for Sebunya's non-renewal. In a document Dunn-Alexander sent to Johnson, then OER Director, she gave the following justifications: He was "nonresponsive to cadre guidance," was "nonresponsive to disaster leadership request," and "refuse[d] to complete deployment products without one-on-one training." Ex. 24 at 011343. Then, in a statement Ms. Dunn-Alexander submitted as part of

Sebunya's EEO investigation, she added that he "had difficulty transitioning to the new direction of the cadre," was "unable to deliver the civil rights mission," and "was non-compliant with cadre's instructions." Ex. 123 at P002189.[7]  Though these justifications are perhaps "abbreviated," see Ex. 18 (Deposition of Agency's 30(b)(6) Designee) at 84:22, they are sufficiently "clear and reasonably specific," Figueroa, 923 F.3d at 1093.

A comparison the circuit relied on in Figueroa illustrates why.  In Paquin v. Federal National Mortgage Association, a case where the employer satisfied McDonnell Douglas's second step, the "fired plaintiff received notice of 'substandard performance' in three areas: the existence of 'repeated or blatant errors in work,' the need for 'increased creativity,' and the need for 'greater insight into investor preferences and valuation processes.'"  Id. at 1091 (quoting Paquin v. Fed. Nat'l Mortg. Assn., 119 F.3d 23, 27 (D.C. Cir. 1997) (cleaned up)).  Though the employer's explanations were light on detail, they did list concrete, employee-specific reasons for the plaintiff's termination.  By contrast, in Figueroa, the employer's justifications for terminating the employee were an "eight page-chart outlining the [d]epartment's core precepts," declarations from board members stating they followed the precepts in evaluating the employee, and the employee's ultimate evaluation as "mid-ranked."  Id. at 1088.  Unlike in Paquin, the Circuit concluded, "[n]one of the presented evidence shed[] light on how the selection boards applied the core precepts" to the employee at issue.  Id. at 1093.  FEMA's justifications meet

---

[7]  The parties dispute whether the Court can consider explanations FEMA offered during litigation, including Ms. Dunn-Alexander's statements at her deposition.  Pl.'s Opp'n at 20; Def.'s Reply at 12–13.  The Court will not wade into this dispute since it finds that FEMA's contemporaneous (or near-contemporaneous) rationales supplied legitimate, nondiscriminatory reasons for Sebunya's termination.

Paquin's standard.  Dunn-Alexander's justifications were specific to Sebunya and described the qualities and skillsets he lacked.

Accordingly, the Court will bypass McDonnell-Douglas's first two prongs and proceed to Brady's core inquiry.  This inquiry is specific to each allegedly discriminatory or retaliatory incident, which the Court will address in turn.

### C.  June 2017 Missouri Disaster

Sebunya claims his June 2017 demobilization from the Missouri disaster constituted both unlawful retaliation and discrimination.

#### 1.   Retaliation

*First*, his retaliation claim.  Sebunya alleges he was "was the subject of retaliation and reprisal because of his participation in an EEO investigation on behalf of" Shelli Holmes. Second Am. Compl. ("SAC") ¶ 108.  Other courts, including courts in this district, have suggested that Title VII "protects a third party who is attempting to help the alleged victim of discrimination assert her rights."  Vidal v. Ramallo Bros. Printing, 380 F. Supp. 2d 60, 62 (D.P.R. 2005); see also Bartolo v. Whole Foods Mkt. Grp., Inc., 412 F. Supp. 3d 35, 46 n.3 (D.D.C. 2019) ("[A]ssisting another employee with her discrimination claim is protected opposition conduct." (quoting Speedy v. Rexnord Corp., 243 F.3d 397, 404 (7th Cir. 2001)). But, to receive Title VII protection, the third party must be engaged in "activity that is adverse to the company [] or outside the employee's normal employment role."  Vidal, 380 F. Supp. 2d at 62.  See Carrion v. Keen, Inc., No. 3:14-CV-454-PK, 2015 WL 9659974, at *18 (D. Or. Oct. 16, 2015), report and recommendation adopted, No. 03:14-CV-00454-PK, 2015 WL 9308259 (D. Or. Dec. 20, 2015) ("[W]here an employee's job responsibilities include advising the employer regarding employment-law compliance issues, reporting the possibility of the employer's

noncompliance . . . does not constitute protected activity unless the employee steps outside the normal role of an employee in that employee's job position to take a position adverse to the employer.").

Sebunya did not step outside his normal employment role when he met with Holmes.  At that time, his job responsibilities included meeting "with employees seeking to file EEO complaints."  Pl.'s Resp. ¶ 9; SAMF ¶ 60; see also Ex. 196 at 33:12–15 (Sebunya Deposition) ("[I]t's [] our job to conduct those [] limited inquir[ies] into [employee EEO] cases, counsel the employees and then try to resolve the issue.").  Accordingly, the Court grants summary judgment to FEMA as to Sebunya's June 2017 retaliation claim.

### 2.  *Discrimination*

*Second*, Sebunya's alleges his demobilization from the Missouri disaster constituted discrimination based on his race.[8]  The Court finds Sebunya survives summary judgment on this claim.  He has created a "genuine issue of material fact as to whether [FEMA gave] the real reason" for his demobilization.  Aka, 156 F.3d at 1290.  "Usually, proffering evidence from which a jury could find that the employer's stated reasons were pretextual will be enough to get a

---

[8]  Sebunya also claims he was subject to discrimination because of his "advocacy on behalf of a Black employee," and "his ongoing opposition to unlawful discrimination including his past service as the President of a branch of the NAACP and his advocacy on behalf of minorities and women."  SAC ¶ 106.  The D.C. Circuit has not chosen sides in a nascent circuit split about whether Title VII recognizes a claim to discrimination based on advocacy on behalf of a protected class member.  Compare Barrett v. Whirlpool Corp., 556 F.3d 502, 513 (6th Cir. 2009) (finding a plaintiff who alleged he was fired due to his "advocacy on behalf of women and minorities" could assert a Title VII claim) with Frith v. Whole Foods Mkt., Inc., 38 F.4th 263, 272 (1st Cir. 2022) (finding that Title VII, as interpreted in Bostock v. Clayton County, 590 U.S. 644 (2020), "forecloses [the Sixth Circuit's] theory, which essentially replaces the textual 'because of such individual's race' with the atextual 'because of such individual's advocacy for protected individuals'").  The parties do not plumb whether this allegation can root a Title VII claim, and the Court need not address the issue since it allows Sebunya's race discrimination to proceed on a different theory.

plaintiff's claim to a jury." <u>George v. Leavitt</u>, 407 F.3d 405, 413 (D.C. Cir. 2005) (cleaned up).

Sebunya, however, has also offered evidence that the relevant decisionmaker harbored

discriminatory animus.  While the evidence of animus does not significantly move the needle in

the Court's view, "a reasonable inference of discriminatory action can be derived from the

evidence as a whole."  <u>Harris v. Wackenhut Servs., Inc.</u>, 648 F. Supp. 2d 53, 67 (D.D.C. 2009),

<u>aff'd</u>, 419 F. App'x 1 (D.C. Cir. 2011) (cleaned up).

a.   <u>Evidence of Pretext</u>

A jury could find FEMA's stated justification for Sebunya's demobilization concealed a

discriminatory motive.  FEMA gave the following explanation for Sebunya's demobilization:

(1) Sebunya's comments to Hetherington, including the anecdote about the KKK and particularly

his statement about "hanging people," made Hetherington "uncomfortable" and "appeared to

contradict the mission of an Equal Rights Advisor," and (2) Sebunya's rearrangement of office

furniture "appear[ed] to the outsider to create a less than inviting setting."  Ex. 100 (Email from

Hetherington to Dunn-Alexander) at P000146.

Sebunya, however, disputes the centerpiece of this justification:  He denies making any

comments about hanging.  Sebunya Decl. ¶ 2 ("When Mr. Hetherington met with me on June 16,

2017, I never told him I was 'good at hanging people on the details,' 'good at taking the fine

details and hanging people,' 'good at hanging people on the technical issues no matter where

they were in the chain of command,' or anything like that.").  And, as Sebunya's supervisors

acknowledged at the time of his demobilization and as the agency now confirms in its briefing,

the "hanging" comment was the "primary reason" for Sebunya's demobilization.  Def.'s Reply at

4; <u>see also</u> Ex. 100 (Email from Hetherington to Dunn-Alexander) at P000146 (the "hanging

people" statement was "[t]he portion of the conversation which continued to nag at me"); Ex. 9

19

(Email from Dunn-Alexander to Sebunya) at 000137 (the hanging comment was the "portion of the conversation which [wa]s most concerning").  Because no one else was present for Sebunya and Hetherington's conversation, this claim "turns on whose account" is "correct"—in other words, which man is more believable.  Aka, 156 F.3d at 1299.  And it is for a jury to make that call.  At summary judgment, the Court must "refrain from making credibility determinations, weighing the evidence, or drawing inferences." Jones, 557 F.3d at 681.[9]

### b.  Evidence of Discriminatory Animus

In addition to challenging FEMA's explanations as pretextual, Sebunya has proffered evidence that Hetherington harbored discriminatory animus.  See Pl.'s Opp'n at 31–32.  As noted above, a "plaintiff in a Title VII case is not limited to challenging the employer's explanation." Holcomb v. Powell, 433 F.3d 889, 899 (D.C. Cir. 2006).  He "can also avoid summary judgment by presenting other evidence, direct or circumstantial, that permits an inference of discrimination," including "discriminatory statements by the employer or other attitudes suggesting the decision maker harbors discriminatory animus." Id. (cleaned up).

Sebunya claims that statements Hetherington made during his deposition reveal his racial animus.  Pl.'s Opp'n at 31–32.  Most notably, Hetherington testified that slavery was "a side topic" of the Civil War and he "believe[s] the Civil War was more of a war against economics

---

[9]  Sebunya has also proffered evidence that the agency's other justification for demobilizing him—that he rearranged furniture in the FEMA office—was pretextual.  Namely, both Dunn-Alexander and Hetherington acknowledged that they had never demobilized employees for moving furniture.  Pl.'s SAMF ¶ 65.  This evidence, however, is of limited value.  Though evidence that "others outside the plaintiff's class have been more favorably treated is 'especially relevant' to a demonstration of pretext," Sebunya has not demonstrated that other employees, much less employees "outside his class" or employees "similarly situated," ever moved furniture.  Wheeler, 812 F.3d at 1115 (quoting McDonnell Douglas, 411 U.S. at 804).  Moreover, the agency itself acknowledges that his furniture-rearranging ranked "second to [his] 'hanging people' comment" in the decision to demobilize him.  Def.'s Reply at 4.

with the industrialization needing products from the south." Ex. 32 at 39:20–40:1.  The parties

dispute the implications of these comments.  Sebunya asserts they reflect beliefs "commonly

advanced by white supremacists and white racists."  Pl.'s Opp'n at 31.  The agency responds that

Hetherington's statements may be due to "inaccurate school instruction related to the Civil War's

causes" and therefore a reasonable factfinder could not conclude Hetherington adheres to white-

supremacist ideology based on a single answer.  Def.'s Reply at 6.[10]

     The Court will avoid wading too deep into this dispute because it would require the Court

to choose between two arguable interpretations of Hetherington's statement, which the Court

cannot do at this stage of the case.  But, because a "reasonable juror could accept [Sebunya's]

interpretation" of the allegedly racist remark, Uzoukwu v. Metro. Wash. COG, 130 F. Supp. 3d

403, 414 (D.D.C. 2015), this evidence bolsters Sebunya's defense against summary judgment.

That said, the Court pauses to note some reasons to doubt Sebunya's claim that Hetherington

harbored racial animus.  For starters, Sebunya has selectively quoted from Hetherington's

---

[10]  Sebunya also claims two comments Hetherington made about unconscious or implicit bias supply evidence of racial animus.  The Court disagrees; Sebunya overstates the facts in reference to one comment and the other does not support an inference of animus.  As to the first, Sebunya claims that "Hetherington acknowledged that he had been trained about implicit bias but he stated, 'I'm not sure I agree with it.'"  Pl.'s SAMF ¶ 63.  However, when Hetherington gave that response, he had not been asked whether he agreed with implicit bias.  Instead, the question posed was: "did your training explain to you that the vast majority of white people in the United States have implicit bias against black people?"  Ex. 32 at 27:18–20.  Moreover, after this back-and-forth, Hetherington explained that he "grew up in Hawaii"—"a multi-cultural island" where the "attitude. . . is to accept everybody as they are"—but he acknowledge that "growing up in Hawaii" did "not make[] [him] immune to any[]" kinds of bias.  Id. at 27:24–28:5.  He also later said he "would assume" "implicit bias against black people is still a big problem."  Id. at 42:23–25.  Second, Sebunya points to Hetherington's admission that he did not "believe [he] considered unconscious bias" when demobilizing Sebunya as evidence of animus.  Id. at 47:1–7.  But, given that Hetherington acknowledged he was susceptible to implicit bias and that he had received training about it, id. 26:11–14, failing to pause and explicitly consider unconscious bias does not support an inference of racial animus.

deposition.  At other points, he stated that "black people [had been] treated horrendously," Ex. 32 at 39:18–19; that discrimination against black people has not "gone away," id. at 42:6–11; and that he did "not disagree at all" that "race discrimination against black people has been [among] the greatest injustice[s] in the history of [] our country," id. at 122:14–18.  Second, Hetherington made this comment during a deposition in December 2022—more than five years after Sebunya's demobilization.  Id. at 1.  An allegedly racist remark is more likely to "provide an inference of discrimination" when made "around the time of the decision" and "in reference to the adverse employment action."  McDaniel v. Vilsack, No. CV 12-723 (EGS), 2016 WL 5349198, at *6 (D.D.C. Sept. 23, 2016), aff'd sub nom. McDaniel v. Perdue, 717 F. App'x 5 (D.C. Cir. 2017) (cleaned up); see also Forman v. Small, 271 F.3d 285, 293 (D.C. Cir. 2001).

Ultimately however, evidence rests on either side of the scale.  Because the Court must not "weigh[] th[at] evidence" at this stage, Jones, 557 F.3d at 681, summary judgment is inappropriate.  Moreover, the Court must consider the evidence of racial animus alongside Sebunya's proffered evidence of pretext, and, as a whole, they permit an inference of discrimination.[11]

D.  June 2017 California Disaster

Next, Sebunya claims Dunn-Alexander retaliated against him for filing an EEO complaint about the Missouri demobilization.  The Court understands Sebunya to allege that Dunn-Alexander retaliated by giving him incorrect instructions for his deployment to California in order to manufacture a reason for his demobilization from that disaster.  In other words, she

---

[11]  The Court reserves judgment on whether Hetherington's deposition statement about the civil war would be inadmissible under Federal Rule of Evidence 403 were the case to proceed to trial.

set him up to fail.  See SAC ¶ 48–49 (After "Mr. Sebunya told [Dunn-Alexander] that he was

planning to file an EEO complaint[,] . . . in [his] very next deployment to California, he was

subjected to adverse and unusual conditions.  Mr. Sebunya was given oral instructions from Ms.

Dunn-Alexander to arrive in California on June 28, 2017, for the start of his deployment."); see

also Pl.'s Opp'n at 2 ("When Ms. Dunn-Alexander called Sebunya on June 20, 2017, to

demobilize him, he told her that he would be filing an EEO complaint.  A few days later, Ms.

Dunn-Alexander began retaliating against him.  She gave him the wrong date for a deployment

to California, which resulted in him being demobilized." (cleaned up)).  The parties' briefing

suggests that the agency's decision to demobilize Sebunya from California—rather than Dunn-

Alexander giving him the wrong deployment date (which in turn resulted in his

demobilization)—constituted the relevant act of retaliation, see Def.'s Mot. Summ. J. at 9, Pl.'s

Opp'n at 23, but the second amended complaint does not make that allegation.  "It is well-

established in this district that a plaintiff cannot amend his Complaint in an opposition to a

defendant's motion for summary judgment."  Petrucelli v. Dep't of Just., 453 F. Supp. 3d 126,

135 (D.D.C. 2020).

    As for the phone call when Dunn-Alexander relayed Sebunya's deployment orders, the

parties tell a slightly different story of what happened.  In his deposition, Sebunya recounted that

Dunn-Alexander called him on June 25 and instructed him to travel to California the following

day.  See Ex. 196 at 117:7–9 ("[S]he sa[id], I want you to go to California.  Travel Monday [June

26], get there on Tuesday, immediately.").  Dunn-Alexander acknowledges that she called

Sebunya on June 25 to discuss his upcoming deployment.  Ex. 117 at P001370.  But she claims

Sebunya "mistook [their] verbal conversation," as well as an earlier email she sent, "to mean that

[he was] supposed to travel on Monday," June 26, instead of the date listed on his deployment order. Id. at P001370–71.

Though this dispute appears genuine, it is not material. What is lacking from Sebunya's evidence is any indication that Dunn-Alexander intentionally misled him in retaliation for filing the EEO complaint. Even if a jury concludes Dunn-Alexander told Sebunya the wrong date, he "would still have to put forth sufficient evidence to enable the jury to find [her] misstatement was more than an honest mistake—*i.e.*, evidence showing [she] did not honestly believe" Sebunya was supposed to travel June 26. Mayorga v. Merdon, 928 F.3d 84, 92 (D.C. Cir. 2019). Sebunya has offered no such evidence, and therefore the Court grants the agency's motion for summary judgment as to the June 2017 California disaster.

E.  Reply-All Email and Late 2017 Deployments Orders

Sebunya claims the reply-all email incident and changes to his deployment orders in late 2017 were retaliation for filing an EEO complaint. SAC ¶ 107.[12] Though certain facts related to these incidents are in dispute, the material ones are not. The parties do not dispute that Suzanne Miller "inadvertently" and "accident[ally]" replied to all with information about Sebunya's EEO complaint. Ex. 6 (Miller Affidavit) at 000108. They do not dispute that OER leadership reassigned Sebunya from the October California deployment because of a personnel issue with EARs at a Nevada disaster. Pl.'s Resp. ¶ 27. And they do not dispute that Sebunya was overly

_____

[12]  The complaint also alleges that Sebunya was subject to "an ongoing retaliatory hostile work environment" based on these incidents. SAC ¶ 107. Sebunya has not offered evidence that he was subject to "discriminatory intimidation, ridicule, and insult that [wa]s sufficiently severe or pervasive to alter the conditions of the [his] employment and create an abusive working environment." Baird v. Gotbaum, 662 F.3d 1246, 1250 (D.C. Cir. 2011) (cleaned up). Nor does he oppose the agency's summary judgment motion on these grounds. The Court thus awards summary judgment to FEMA as to Sebunya's hostile work environment claim.

qualified for the Puerto Rico assignment.  Ex. 17 at 1.  Other than the temporal proximity

between the filing of his complaint and these incidents, Sebunya has offered no evidence

rebutting these explanations or demonstrating that the agency's decisions were motivated by

retaliatory purpose.  While "temporal proximity can [] support an inference of causation for

purposes of establishing a prima facie case of retaliation, once a defendant proffers a legitimate

reason for its adverse action, temporal proximity standing alone is not sufficient to defeat the

proffer and to support a finding of retaliation."  Husain v. Barsa, No. CV 15-708 (RDM), 2021

WL 663206, at *14 (D.D.C. Feb. 19, 2021) (cleaned up); see also Woodruff v. Peters, 482 F.3d

521, 530 (D.C. Cir. 2007) ("If temporal proximity sufficed to rebut a legitimate proffer, then

protected activities would effectively grant employees a period of immunity, during which no

act, however egregious, would support summary judgment for the employer in a subsequent

retaliation claim.").  On this record, the Court finds no evidence of retaliation and grants

summary judgment to FEMA as to these incidents.

F.   2020 Termination

Finally, Sebunya has alleged that he was terminated in retaliation for filing EEO

complaints and because of his race, color, national origin, religion, and age.  SAC ¶¶ 109, 115.[13]

As the agency's proffered explanation for his termination is the same for both his retaliation and

discrimination claims, the Court will start there.

_____

[13]  Sebunya also alleges that he was terminated in retaliation for "opposing unlawful
discrimination and retaliation within the Agency."  SAC ¶ 109.  But, as with his demobilization-
retaliation claim, he has produced no evidence that he opposed discrimination or retaliation
"outside [of his] normal employment role" as an ERA.  Vidal, 380 F. Supp. 2d at 62.

The agency claims Sebunya was terminated primarily because he could not adapt to OER's new direction.  Def.'s Mot. Summ. J. at 15.  Recall that in 2019, OER shifted its focus from a combination of "internal" civil rights work (*i.e.*, processing employee EEO complaints) and "external" work (*i.e.*, ensuring equal access to FEMA services, programs, and benefits) to solely external work.  Ex. 129 (Montgomery EEO Investigative Affidavit) at D005807; Pl.'s Resp. ¶ 30.  As part of this shift, the agency instituted new procedures for ERAs.  For example, ERAs received new guidance on how to conduct community analyses, Ex. 18 (Deposition of Agency's 30(b)(6) Designee) at 53:2–6, and new procedures for uploading documents to FEMA's shared document drive, Ex. 20 (O-Drive Presentation).[14]

At the time Dunn-Alexander recommended Sebunya be terminated, she listed three justifications:  He was "[n]onresponsive to cadre's guidance, [r]efused to complete deployment products without one-on-one training, and [was] nonresponsive to disaster leadership request."  Ex. 24 (Email from Dunn-Alexander to Johnson) at 011343.  She expanded on these explanations in the investigative affidavit she completed as part of Sebunya's EEO investigation.  She wrote, Sebunya "had difficulty transitioning to the new direction of the cadre.  We were going one hundred percent focused on civil rights.  He was not able to deliver the mission."  Ex. 123 at P002189.  As the primary evidence that Sebunya "had not shown he could perform th[e] new duties," Def.'s Mot. Summ. J. at 15, the agency points to the audits of the O Drive, which reflected that Sebunya's folders were empty for one disaster and less-than-half filled for another.  Ex. 22 at 3, 8.

---

[14]  Though Sebunya quibbles with the agency's characterization of the 2019 transition as a "shift," see Pl.'s Opp'n at 25, he does not dispute that the agency instituted new procedures, including O-Drive requirements, in 2019, and he acknowledges that OER underwent a "technological transition," id. at 40.

Sebunya challenges this justification as pretextual and asserts that he was instead terminated for retaliatory and discriminatory reasons.  He has offered both evidence of pretext (which applies equally to his retaliation and discrimination claims) and evidence of retaliatory and discriminatory animus (which the Court will parse in reference to each claim).

> 1.    *Evidence of Pretext*

Starting with the evidence of pretext, the Court finds it, as a whole, insufficient to permit an inference of retaliation or discrimination.[15]

*First*, Sebunya claims Dunn-Alexander offered shifting views about the importance of OER's new document-tracking systems.  In February 2020, after Dunn-Alexander informed Sebunya that an O-Drive audit found two of his disaster assignments "completely empty of required documentation," he responded, "I still need the help that I needed with the 'O' drive and other new methods of documentation.  I was allowed to ask you [to] deploy a person to assist me in catching up with was needed, up to now I still need that assistance."  Ex. 27 (Emails between Sebunya and Dunn-Alexander) at 000627.  Dunn-Alexander replied that his "request for assistance [was] unrelated to our Civil Rights Program requirements."  Id. at 000626.  Sebunya casts this statement as inconsistent with Dunn-Alexander's later deposition testimony that "his weekly reports," and other "information that was supposed to be . . . documented on the trackers" did not "substantiate that he knew how to deliver the civil rights mission."  Ex. 21 (Dunn-Alexander Deposition) at 238:18–25.

---

[15]  The Court will address Sebunya's most salient pretext evidence and therefore does not canvass every point he raised in his opposition brief.  But having considered all of Sebunya's proffered evidence of pretext, the Court has satisfied itself that the evidence does not alone permit an inference of retaliation or discrimination.

These statements only appear inconsistent when divorced from their context.  Dunn-Alexander's February 2020 response to Sebunya actually read:  "Your request for assistance is unrelated to our Civil Rights Program requirements.  When we spoke of Alexandria deploying, her role was only to conduct a compliance audit."  Ex. 27 at 000626.  In other words, between the February 2020 email and her deposition, Dunn-Alexander maintained that compliance with the document-tracking system was critical to OER's mission.  Her email that Sebunya's request for help was "unrelated" to the mission instead reflected that she had never guaranteed Sebunya individual training on the O Drive; rather, she had mentioned that another ERA would deploy to perform an O-Drive audit.  See also Ex. 24 (Email from Dunn-Alexander to Johnson) at 011343 (Sebunya "[r]efused to complete deployment products without one-on-one training").  Thus, Dunn-Alexander's "statements . . . are materially consistent, and are therefore not probative of pretext."  Brisbon v. Tischner, 639 F. Supp. 3d 164, 183 (D.D.C. 2022), aff'd, No. 23-5007, 2023 WL 5162363 (D.C. Cir. Aug. 9, 2023) (cleaned up).

*Second*, Sebunya claims that comparable employees who failed to comply with the record-keeping system were not terminated.  Specifically, he notes that the O-Drive Audit reflected that four other employees serving at "active" disaster sites (Heather Biggers, Tam Nguyen, Patricia Glenn, and Ricardo Garcia-Rodriguez) had not uploaded any files.  Pl.'s SAMF ¶ 138 (citing Ex. 181 at D000738).  Those employees were renewed in March 2020.  Ex. 135 at 2–5.  Though the "question of whether employees are similarly situated in order to show pretext ordinarily presents a question of fact for the jury," Wheeler, 812 F.3d at 1115 (cleaned up), it is clear the employees were not similarly situated in one critical, and ultimately dispositive, respect:  At the time of the audit, the folders for the Biggers, Nguyen, and Glenn disasters were

listed as "access [] pending," indicating they were unable to post files to the folder.  Ex. 181 at 000738.

*Third*, Sebunya notes that Dunn-Alexander—and the agency in response to document requests submitted during litigation—did not substantiate the stated justification that Sebunya was "nonresponsive to disaster leadership request."  See Ex. 21 (Dunn-Alexander Deposition) at 152:1–14; SAMF ¶ 133.  Moreover, his last official performance evaluation, dated March 27, 2020, stated that he "worked well with others[,] [he] carried out his duties independently and professionally," and "[h]is engagement with managers was of great value to the smooth running of the operation."  Ex. 137 at P002131.  But, as Dunn-Alexander indicated in her EEO investigative affidavit and her deposition, the primary reason for Sebunya's termination was his "difficulty transitioning to the new direction of the cadre."  Ex. 123 (Dunn-Alexander EEO Investigative Affidavit) at P002189; Ex. 21 (Dunn-Alexander Deposition) at 238:14–15 ("His inability to deliver the civil rights mission was the factor [in his termination in March 2020]").  The agency's failure to substantiate a peripheral justification does not create a genuine issue of material fact.  See Sagar v. Mnuchin, 305 F. Supp. 3d 99, 117 (D.D.C. 2018), aff'd, No. 18-5183, 2019 WL 667201 (D.C. Cir. Jan. 29, 2019) (setting aside a "contention" "peripheral to the substance of [the employer's] criticism").

*Fourth*, Sebunya contends that Dunn-Alexander and Johnson deviated "from established procedures or criteria" by cutting James Montgomery, the supervisor who rejected Dunn-Alexander's recommendation to terminate Sebunya in 2018, out of the hiring process.  Pl.'s Opp'n at 29; see also Jeffries v. Barr, 965 F.3d 843, 858 (D.C. Cir. 2020) ("[D]eviation from [] standard practices . . . can justify an inference of discriminatory motive." (cleaned up)).  Johnson testified at her deposition, however, that she had a "[s]trong suspicion" that she did not share

appointment decisions with Montgomery because "he was under disciplinary review" at that time.  Ex. 25 at 21:13–22:3.  Though Montgomery later stated he too had been "targeted" on the basis of protected traits, Ex. 129 (Montgomery EEO Investigative Affidavit) at 005906, Sebunya offers nothing to rebut Johnson's recollection that Montgomery was under disciplinary review.

*Fifth*, Sebunya points out that neither Dunn-Alexander nor Johnson carried out a systematic review of ERAs or compared Sebunya to other employees.  Ex. 21 (Dunn-Alexander Deposition) at 158:17–21, 160:15–20; Ex. 25 (Johnson Deposition) at 33:11–13.  He claims this failure shows that the agency relied on "subjective criteria," which are to be treated "with caution on summary judgment."  Pl.'s Opp'n at 29 (quoting Hamilton v. Geithner, 666 F.3d 1344, 1356 (D.C. Cir. 2012)).  But Dunn-Alexander testified that she did rely on "quantitative data" when deciding whether to terminate Sebunya.  Ex. 21 (Dunn-Alexander Deposition) at 160:2.  She, of course, looked at the results of the O-Drive Audit.  Ex. 22.  She also reviewed "stakeholder engagement roster[s]," "site inspection registr[ies]," "record[s] of referral," and "weekly report submission[s]," as well as other factors such as "engagement in trainings [and] participating in advisor-required meetings."  Ex. 21(Dunn-Alexander Deposition) at 160:3–14.  Sebunya does not rebut this testimony but rather faults his supervisors for failing to compare his performance along those metrics to other employees' performance.  But "the fact that [a review] may not have been as thorough as [the employee] would have liked does not establish pretext."  Cheatham v. Mayorkas, No. CV 18-03026 (CKK), 2021 WL 4148359, at *18 (D.D.C. Sept. 13, 2021).[16]

---

[16]  Sebunya also faults Dunn-Alexander for not considering his history of positive performance evaluations in deciding to recommend him for termination.  Pl.'s Opp'n at 29. Dunn-Alexander explained in her deposition, however, that the evaluations were of limited use because they reflected the views of only on-site disaster supervisors, and not reservists' cadre coordinators.  Ex. 21 at 152:21–153:8.  She explained, "there's [a] side of the work that the disaster [supervisors] cannot analyze," namely "the accountability systems for the cadre."  Id. at

Therefore, Sebunya's rebuttal evidence alone does not get him over the finish line.  He has, however, offered additional evidence from which a jury could infer that the agency terminated him for retaliatory or discriminatory reasons.

2.    *Additional Evidence of Retaliation*

Sebunya has offered both direct and indirect evidence of retaliation.  Before getting to the facts, a note on the standard for direct evidence in discrimination cases:  Direct evidence removes a claim from the McDonnell-Douglas framework.  See Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985) ("[T]he McDonnell Douglas test is inapplicable where the plaintiff presents direct evidence of discrimination.").  Instead, if a "plaintiff offers direct evidence of discriminatory intent, that evidence will generally entitle [him] to a jury trial." Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 576–77 (D.C. Cir. 2013) (cleaned up).

Sebunya's direct evidence is as follows.  In an email Dunn-Alexander sent to herself in February 2020, she attached a spreadsheet with recommendations for ERAs who should be terminated.  Ex. 202.  For Sebunya, she wrote in part, "he's a problem and his answer to everything is to file a complaint." Id. at 011298.  The agency disputes that Dunn-Alexander was referring to Sebunya's EEO complaint and notes that Sebunya had previously threatened to complain about Dunn-Alexander to her supervisors.  Def.'s Reply at 9.[17]  But, because the parties reasonably dispute the meaning of Dunn-Alexander's reference to "complaint," Sebunya

---

152:24–153:1, 6–7.  And, as Dunn-Alexander described earlier in the deposition, the accountability systems referred to the file-sharing platforms "where [OER] work is stored" and "tracked"—systems like SharePoint and the O Drive.  Id. at 138:11–14.

[17]   The parties do not address whether Sebunya's threat to complain about Dunn-Alexander to supervisors, itself, constituted protected activity under Title VII nor does the Second Amended Complaint allege that Sebunya was retaliated against for threatening to complain.  See SAC ¶ 108.  The Court, therefore, will not address this issue.

has raised a genuine issue of material fact that warrants a jury determination.  See also Lane v. Vasquez, 961 F. Supp. 2d 55, 75 (D.D.C. 2013) (holding that an employer's statement invoking the plaintiff's EEO complaint was direct evidence that entitled the plaintiff to a jury trial on his retaliation claim).

Stepping back into the McDonnell-Douglas framework, Sebunya has also proffered indirect evidence that permits an inference of retaliation.  When Dunn-Alexander recommended Sebunya for termination in 2018, she also recommended three other employees who had filed EEO complaints against her.  SAMF ¶ 70; Ex. 138 (Dunn-Alexander EEO Investigative Affidavit) at D0005747; Ex. 21 (Dunn-Alexander Deposition) at 131:23–23:15.  She again recommended Sebunya and those three employees for termination in 2020.  Ex. 168 (Email from Dunn-Alexander to Johnson) at 005840–41.  By contrast, no ERA reappointed in 2020 had filed an EEO complaint against Dunn-Alexander.  Ex. 134 (Defendant's Interrogatory Response) at 4–7; Beard Decl. ¶ 6.  An "employer's pattern of poor treatment of other employees in the same protected group as the plaintiff," and by extension other employees who engaged in the same protected activity as the plaintiff, "may support an inference that the employer's stated reasons were pretextual."  Walker v. Johnson, 798 F.3d 1085, 1092 (D.C. Cir. 2015).

Other evidence also undercuts Dunn-Alexander's reasons for recommending the employees for non-renewal in 2018.  James Montgomery, Dunn-Alexander's supervisor, attested in response to another employee's EEO complaint that "[t]here was no basis for non-reappointment of the Complainant or any of the others in 2018."  Ex. 129 at 005812.  He explained that "Roslyn [Dunn-Alexander] was trying to terminate the same group of individuals in 2018 and there just was not a basis for it.  Roslyn told me that they did not like and did not support her.  The [n]on-discriminatory basis would be whether or not they were performing.

32

There was nothing to indicate that they were not performing in their positions as Equal Rights Advisors." Id.

Accordingly, the Court denies the agency summary judgment as to Sebunya's retaliation claim.

### 3. *Additional Evidence of Discrimination*

Turning to the other half of Sebunya's termination claim, the Court finds he survives summary judgment on his race and color discrimination claims, but not his national-origin, religion, or age discrimination claims.

#### a. Race, Color, and National Origin

Sebunya alleges that he was discriminated against because of his race, color, and national origin. SAC ¶¶ 110–11. He suggests he need not distinguish among the three characteristics because they "are generally analyzed together." Pl.'s Opp'n at 37. Though claims of race and national-origin discrimination sometimes go hand in hand, see Ortiz-Diaz v. U.S. Dep't of Hous. & Urb. Dev., Off. of Inspector Gen., 867 F.3d 70, 74 (D.C. Cir. 2017), Sebunya has offered only conclusory evidence of national-origin discrimination. Namely, as noted above, Montgomery swore in an affidavit for another employee's EEO investigation that he, along with Sebunya and other employees, were "targeted because of age, race, and national origin." Ex. 129 (Montgomery EEO Investigative Affidavit) at 005806. This "single statement is not enough to create a genuine dispute of fact." Beyene v. Hilton Hotels Corp., 815 F. Supp. 2d 235, 246 n.10 (D.D.C. 2011), aff'd, 573 F. App'x 1 (D.C. Cir. 2014); see also Anderson, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient"). It is conclusory and lacks "factual basis in the record." Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp., 564 F.3d 462, 465 (D.C. Cir. 2009)

(refusing to rely on a "conclusory" affidavit from the non-movant's witness).  Accordingly, the

Court grants the agency's motion as to Sebunya's national-origin claim.

Sebunya's race and color claims, however, find solid footing.  A much higher percentage

of African-American ERAs were terminated in 2020 than were renewed.  Seven of nine (78

percent) non-renewed ERAs were African American compared to 15 of 55 (27 percent) renewed

ERAs.  Ex. 135 (Sebunya's Compilation of Defendants' Interrogatory Responses); see also Ex.

133 (Defendant's Responses to First Set of Interrogatories) at 6–7; Ex. 134 (Defendant's

Supplemental Responses to First Set of Interrogatories) at 4–7.  As a result, seven of 22 African-

American ERAs were terminated in 2020.  Moreover, of the new ERAs hired between March

2020 and June 2022 (when the agency submitted its interrogatory responses), 15 of 33 (45

percent) were African American.  Ex. 135.  Thus, as a percentage, substantially more African-

American ERAs were terminated in 2020 (78 percent) than were subsequently hired (45 percent).

As the D.C. Circuit has noted, "[s]howing that others outside the plaintiff's class have been more

favorably treated is '[e]specially relevant' to a demonstration of pretext."  Wheeler, 812 F.3d at

1115 (quoting McDonnell Douglas, 411 U.S. at 804).

As additional support, Sebunya notes that other OER employees described that Jo Linda

Johnson, the unit's former director, discriminated against African-American employees.  In May

2020, another employee filed an official complaint against Johnson.  Ex. 162 (OPR Interview of

Nicole Oke) at 006922.  During the investigation of that complaint, employees gave the

following statements:

- "Johnson has aggressively purged OER of African American employees via unethical and discriminatory methods," Ex. 149 (Cheryl Ambush Declaration) at 006972;

- "There is a distinct difference between how Ms. Johnson communicates with non-African Americans.  She is more playful and light on them.  If they do not meet

their metrics her response is not as heavy handed as it is with us, African American employees," Ex. 152 (Donna Peterkin Declaration) at 006822;

- "One employee has started to say 'Black Careers Matter' in response to the manner that Jo Linda has systematically worked to clear out the African American employees within OER," id. at 006819; and

- "African American employees in OER [we]re subject to performance standards different from non-African American staff," Ex. 162 (OPR Interview of Nicole Oke) at 006923.

Moreover, both Johnson and Dunn-Alexander stated that OER lacked "diversity" at a time when it was majority African American.  See Ex. 149 at 006972 (Johnson "has repeatedly stated that OER lacks 'diversity,' which we soon learned was coded language meaning, 'too Black,' as we have lost near (or over) 30 employees in OER, all of whom are African American."); Ex. 141 (Roslyn Dunn-Alexander Declaration) at 006876 ("When JoLinda came in the office was not diverse—it was probably 90-95% black or African American . . . . I think there was only one Caucasian. There is some diversity in the office now.").  Though these statements, alone, might seem "conclusory" and therefore insufficient to establish racial animus, see Ass'n of Flight Attendants-CWA, AFL-CIO, 564 F.3d at 465, the Court finds the evidence, when viewed alongside Sebunya's proffered statistics, supports an inference of discrimination.

The agency disputes that an inference can be drawn and offers three arguments in support.  None hits the mark.  One, the agency claims that Sebunya's "connection with Johnson is far more attenuated than other employees who worked in the EEO Office's main physical office alongside Johnson."  Def.'s Reply at 14.  But regardless of whether they often interacted, the agency does not dispute that Johnson was aware of Sebunya's race, id., and was ultimately responsible for the decision to terminate him, Pl.'s Resp. ¶ 39.  Evidence of "discriminatory statements by the employer" or "other attitudes suggesting the *decision maker* harbors

discriminatory animus" "permit an inference of discrimination."  Holcomb, 433 F.3d at 899

(emphasis added).

Two, the agency suggests the Court discount Johnson's statements because Sebunya has

no evidence "that Johnson ever gave instructions to Dunn-Alexander to not renew African

American employees."  Def.'s Reply at 14.  But discriminatory statements permit an inference of

discrimination even if not related to the exact subject of the plaintiff's complaint.  See, e.g., Stoe

v. Barr, 960 F.3d 627, 643 (D.C. Cir. 2020) (finding "a jury might find" an employer's generally

"sexist treatment against women" "to be compelling evidence of discriminatory motive, which

caused [the employer] to [deny the employee a promotion] because of her gender").

And, finally, the agency contends that because Johnson is African American, "common

sense suggests that [it] is unlikely" "for a person to engage in racial discrimination against

someone of the same race."  Def.'s Reply at 14 (quoting Battle v. Mnuchin, 480 F. Supp. 3d 198,

206 (D.D.C. 2020)); see also id. at 206 ("The presence of a same-race hiring official is thus a

factor that weighs against an inference of discrimination.").  But, of course, that "common-

sense" assumption is not always right.  See, e.g., Jackson v. Starbucks Corp., No. CV 19-1487

(RC), 2022 WL 888180, at *6 (D.D.C. Mar. 25, 2022) ("[C]ases do not foreclose the possibility

that an individual might discriminate against someone of their own race.").  And, even if

Johnson's own race weighs against an inference of discrimination, the rest of Sebunya's

evidence supports such an inference, regardless of the ultimate merits of the employees'

complaints.

Accordingly, the Court denies the agency's motion for summary judgment as to

Sebunya's claim that he was terminated because of his race and color.

b. <u>Religion</u>

The Court will grant the agency's motion as to Sebunya's religious discrimination claims, however.  He alleges he was terminated because he is Muslim, SAC ¶¶ 110–11, but fails to muster sufficient evidence to support an inference of discrimination.

*First*, Sebunya contends that Dunn-Alexander was "hostil[e] to the right to religious accommodation" and bore "animosity towards Mr. Sebunya and his religion."  Pl.'s Opp'n at 42. The undisputed facts do not support these contentions.  In October 2019, Sebunya emailed Dunn-Alexander that he would be absent from an ERA training because of his "Friday . . . mass prayer @ 1:00pm."  Ex. 186 at 011686.  Dunn-Alexander forwarded the email to Michael Looney, OER's Disability Program Manager, and wrote, "I would like to discuss a concern I have with an employee who frequently attend[s] Mass for prayer while deployed."  <u>Id.</u>  After Looney explained he was unsure how to handle "religious requests," Dunn-Alexander forwarded the thread to Amanda Vallejo, OER's Civil Rights Compliance Officer.  <u>Id.</u> at 011699–700. Sebunya claims Dunn-Alexander's use of the word "concern" reveals her animosity to his religion.  Pl.'s Opp'n at 42.  But the context of her emails and statements in her deposition dispel that notion.  She sent Sebunya's message to a disability program manager and a civil rights compliance officer—the exact individuals who could help her manage requests for accommodation.  And in her deposition, she explained, "I reached out to [Looney] so I could know how to accommodate."  Ex. 21 (Dunn-Alexander Deposition) at 231:14–15.

*Second*, Sebunya claims Dunn-Alexander "displayed a disregard for the right to religious accommodations," Pl.'s Opp'n at 42, because she did not construe Sebunya's email as a "request for an accommodation," Ex. 21 (Dunn-Alexander Deposition) at 230:15–17.  This claim misses the mark.  Vallejo, OER's Civil Rights Compliance Officer, also did not interpret Sebunya's

email as an accommodation request.  After Dunn-Alexander forwarded Sebunya's email, Vallejo explained, "the employee should formally request a religious accommodation (time off) from their supervisor – the supervisor should engage in an interactive conversation after the employee request[s] the religious accommodation – the supervisor then evaluates the impact to the FEMA mission and work[s] out the accommodation request."  Ex. 186 at 011691.  She then followed up a few minutes later with the instruction "[h]ave the employee request the accommodation (documented) before engaging in the interactive process."  Id. at 011703.  Moreover, even assuming Sebunya's email constituted a request, he has offered no evidence that Dunn-Alexander required him to attend the training—in other words, that she disregarded his request—or that he sought accommodations beyond that one training.  See Ex. 21 (Dunn-Alexander Deposition) at 227:12–16, 231:12–14 ("There was no coordination with operational leadership for [him] to be gone for a specific amount of time any specific day to fulfill [his] personal religious obligations . . . . [H]e was making me aware that he wasn't going to be in that particular webinar.").

Third, and finally, Sebunya contends that an inference of discrimination can be drawn because Dunn-Alexander "l[ied] when she claimed not to know Mr. Sebunya's religion."  Pl.'s Opp'n at 42.  In an affidavit she completed for Sebunya's EEO investigation and then again in her deposition, she stated that she was unaware of his religion.  Ex. 123 at P002187; Ex. 21 at 226:22–23.  Sebunya responds with two emails he claims show her knowledge of his religion. After explaining how employees could seek religious accommodations, Vallejo sent Dunn-Alexander a list of "tips for accommodating Muslim employees."  Ex. 186 at 011703.  Then, in February 2020, Dunn-Alexander sent another employee an email with several attachments and no text.  Id. at 011698.  The attachments were emails titled, among others, "Religious

accommodation Muslim employees," and "RE_Religious Accommodation brief overview of religious accommodation."  Id.  Based on these emails, Sebunya has not demonstrated that Dunn-Alexander knew he was Muslim and accordingly "lied" when she denied knowing his religion.  Neither email states that Sebunya is Muslim, and Dunn-Alexander testified that she did not "inquire about his religion" and that his reference to "mass" and "prayer" did not "tell [her] what specific religion" he practiced.  Ex. 22 at 227:7–10.  Sebunya presents no evidence rebutting this testimony.

The Court thus grants the agency's motion as to Sebunya's religious discrimination claim.

### c.  Age

Finally, the Court turns to Sebunya's claim of age discrimination, which fares no better than his religious discrimination claim.  He relies on two pieces of evidence, neither of which raises an inference of age discrimination.

*First*, he claims Dunn-Alexander "did not terminate younger employees who had difficulties with the technological transition."  Pl.'s Opp'n at 40.  But the facts do not back that claim up.  In March 2020, Dunn-Alexander directed Liani Figueroa Salivia, a 37-year-old ERA, to "upload [her] weekly report for March 1–7, 2020 onto the O-Drive."  Ex. 177 (Email from Dunn-Alexander) at 000598; Ex. 135 (Sebunya's Compilation of Defendants' Interrogatory Responses) at 2.  After emailing with another colleague, Figueroa Salivia asked which report template Dunn-Alexander preferred she use.  Ex. 177 at 000596.  Based on this email alone, Sebunya labels Figueroa Salivia as having had "difficulties with the technological transition."  Pl.'s Opp'n at 40.  But her email reflected that she understood OER's various platforms and was simply seeking clarification about a single template.  See id. at P000596 ("For clarification

purposes, we have had several conversations about the OER weekly reports over the past year . .

. .  As agreed during those conversations, all our reports are recorded on the SharePoint.  We are

still awaiting the new Weekly report form/template since the 2019 MRT.  Please advise if you

want us to fill out the old format which does not include or reflect the OER Civil Rights

redirection and upload them to the O Drive.")  By contrast, in an email Sebunya sent a week

before Dunn-Alexander's exchange with Figueroa Salivia, he revealed much less familiarity with

OER's platforms.  For example, he asked, "What are the documents that are supposed to be

posted on the O drive for every disaster," "What documents do we put on the share point. (shared

points?)," "How do I use my personal folder and what is stored on it."  Ex. 28 at 000225.  The

June 2019 O-Drive Audit also reflected that Figueroa Salivia had much greater facility with

OER's platforms.  Compare, e.g., Ex. 22 at 9 ("[Figueroa Salivia] has done fantastic job with

File Naming Convention.") with id. at 8 ("[Sebunya] should review file naming convention and

move blank documents to private folder or OER FORMS folder.").

Next, Sebunya notes that the average age of terminated ERAs (53.89) was higher than the

average age of renewed ERAs (51.75) and much higher than the average age of the replacement

ERAs (47.45).  Ex. 135.  But these age gaps, alone, do not permit an inference of discrimination.

In a case where the employer replaced an employee with a "woman [] seven years her junior,"

the D.C. Circuit held that the employer's decision was "insufficient for a jury to conclude that

she 'lost out *because of [her] age*.'"  Dunaway v. Int'l Bhd. of Teamsters, 310 F.3d 758, 767

(D.C. Cir. 2002) (quoting O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996));

see also Grosjean v. First Energy Corp., 349 F.3d 332, 338 (6th Cir. 2003) ("The overwhelming

body of cases in most circuits has held that age differences of less than ten years are not

significant enough to make out [an] age discrimination prima facie case.").  The same is true here.

* * *

That winding path through Sebunya's claims ends as follows.  The Court grants the agency's motion as to Sebunya's claim that he was (1) retaliated against in the incidents involving the June 2017 Missouri disaster, June 2017 California disaster, reply-all email, and late 2017 deployment orders; and (2) terminated because of national-origin, religious, or age discrimination.  But his other claims—that he was (1) discriminated against in the Missouri disaster and (2) retaliated against and discriminated against on the basis of race and color in his termination—do survive summary judgment.  That leaves Sebunya's cross-motion on the agency's affirmative defense that he failed to mitigate damages.

### G.  Mitigation of Damages

Under Title VII, "[i]nterim earnings or amounts earnable with reasonable diligence" reduce any award of back pay.  See 42 U.S.C. § 2000e-5(g)(1).  "The employer has the burden of proving failure to mitigate."  Peyton v. DiMario, 287 F.3d 1121, 1128 (D.C. Cir. 2002).  "Generally, employers carry their burden by establishing that (1) the claimant did not make reasonably diligent efforts to find other suitable employment and (2) other suitable employment was, in fact, available."  Coulibaly v. Pompeo, No. CV 14-712 (RC), 2020 WL 1536185, at *7 (D.D.C. Mar. 31, 2020).  The D.C. Circuit has suggested, however, that the employer need not prove the second factor if it establishes the first.  See N.L.R.B. v. Madison Courier, Inc., 472 F.2d 1307, 1319 (D.C. Cir. 1972) ("[T]he employer is not under the severe burden of establishing that a particular discriminatee *would have* located suitable interim employment had he only made the required effort, before the back pay liability may properly be reduced.  With

such diligence lacking, the circumstance of a scarcity of work and the possibility that none would

have been found even with the use of diligence is irrelevant." (cleaned up)); see also Coulibaly,

2020 WL 1536185, at *7 n.4 (citing cases in the Title VII context).[18]

The agency has raised no genuine issue of material fact, and therefore summary judgment

in Sebunya's favor is appropriate.  On the first factor, the agency notes that Sebunya provided no

evidence that he applied for jobs in "seven of [the] months" between March 2020 (his

termination) and January 2022 (the start of his current employment).  Def.'s Opp'n at 3.  Though

failing to apply for jobs during seven months of unemployment would likely create a genuine

dispute about the reasonableness of search efforts, the agency has not demonstrated that Sebunya

failed to apply.  Instead, all it has done is point out that *Sebunya* has not affirmatively proffered

an uninterrupted record of job applications.  The agency confuses its burden.  It, not Sebunya,

bears the burden of persuasion on its affirmative defense, and therefore this evidence does not

create a genuine issue.  See also Celotex, 477 U.S. at 324 ("Rule 56(e) [] requires the nonmoving

party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to

interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine

issue for trial.'" (quoting Fed. R. Civ. P. 56(e)).

On the second factor, the agency again mistakenly places the burden of persuasion on

Sebunya.  It notes he "has not provided any evidence regarding the availability of jobs with

similar pay to his position [at FEMA] in his commuting area."  Def.'s Opp'n at 3.  The agency—

---

[18]  In Madison Courier, Inc., the D.C. Circuit examined § 10(c) of the National Labor
Relations Act.  472 F.2d at 1315.  But the Supreme Court has counseled that § 10(c), which was
passed "prior to enactment of the Civil Rights Act of 1964," "gives [] guidance as to the proper
meaning of the same language in § 706(g) [42 U.S.C. § 2000e-5(g)] of Title VII."  Pollard v. E.I.
du Pont de Nemours & Co., 532 U.S. 843, 849 (2001).

not Sebunya—bears the "burden of proving failure to mitigate." Peyton, 287 F.3d at 1128.[19]  In

its opposition brief, FEMA does point to a single job opening for a Director of Diversity, Equity,

and Inclusion for Planned Parenthood of Northern New England.  Def.'s Opp'n at 4 n.2.  Putting

aside that the agency has not demonstrated the position was available prior to November 2023 or

that the position was comparable to Sebunya's previous employment, an assertion, "contained

only in a [] brief and unsupported by facts in the summary judgment record, is simply

insufficient to satisfy [the agency's] obligations under Federal Rule of Procedure 56."  Benton v.

Laborers' Joint Training Fund, 121 F. Supp. 3d 41, 52 (D.D.C. 2015); see also Fed. R. Civ. P.

56(c)(1) (requiring a party at summary judgment to support factual assertions by "citing to

particular parts of materials in the record").

        The agency has thus failed to show, as a matter of law, that Sebunya did not mitigate

damages.  The only question is for what time period.  Though Sebunya notes that "[v]ictorious

Title VII plaintiffs are presumptively entitled to back pay until the date judgment has been

entered," Pl.'s Reply at 6 (quoting Lewis v. D.C., 791 F. Supp. 2d 136, 142 (D.D.C. 2011)), that

does not answer the Court's question.  Sebunya may be presumptively entitled to back pay up

until the date of judgment, but FEMA can reduce that amount by proving he failed to mitigate *for

any time period* between termination and judgment.  In other words, the timelines for Sebunya's

back-pay presumption and FEMA's affirmative defense are not necessarily identical.  Instead,

---

    [19]  As Sebunya notes, one case FEMA cites seems to suggest the employee must show the
absence of a material dispute on a failure-to-mitigate defense.  See Williams v. Red Coats, Inc.,
No. 1:20-CV-00571 (CJN), 2021 WL 4476770, at *8 (D.D.C. Sept. 30, 2021) ("Williams has not
demonstrated that there is no material dispute about these issues.").  But the circuit is clear that
the burden rests with the employer.  Peyton, 287 F.3d at 1128.  And, in any event, a genuine
dispute did exist in Williams as the plaintiff "concede[d] she did not submit job applications or
work with a staffing agency."  2021 WL 4476770, at *8.

the Court finds that Sebunya is entitled to partial summary judgment on the failure-to-mitigate

defense for the period between his termination and the close of discovery.  If FEMA possesses

evidence that Sebunya failed to mitigate damages since then, the government may seek to

introduce that evidence at trial.

**IV.   Conclusion**

For the foregoing reasons, it is hereby

**ORDERED** that [ECF No. 56] Defendant's Motion for Summary Judgment is

GRANTED in part and DENIED in part.  It is further

**ORDERED** that [ECF No. 68] Plaintiff's Cross-Motion for Partial Summary Judgment is

GRANTED.  It is further

**ORDERED** that [ECF No. 75] Plaintiff's Motion for Oral Argument is DENIED as

moot.  It is further

**ORDERED** that the parties shall submit a joint status report by March 22, 2024

suggesting a course for further proceedings in this case.

**SO ORDERED**.


Date: March 8, 2024                                      _____
                                                        CHRISTOPHER R. COOPER
                                                        United States District Judge

44